UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLIE WASHINGTON-FISK,

                Plaintiff,                    Civil Action No. 2:11-cv-15117

        v.                          District Judge David M. Lawson
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]**

Plaintiff Leslie Washington-Fisk appeals the final decision of Defendant Commissioner of Social Security denying her application for Disability Insurance Benefits and Supplemental Security Income. Before the Court for a Report and Recommendation (ECF No. 2), are the parties' cross-motions for summary judgment (ECF Nos. 10, 13).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the ALJ did not adequately explain his reasons for denying Plaintiff benefits. Because this error inhibits the Court's substantial evidence review, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 21, 2009. (Tr. 19.) The Commissioner of Social Security ("Commissioner") initially denied Plaintiff's disability applications on June 10, 2010. (*Id.*) Plaintiff then filed a request for a hearing, and on March 23, 2011, she appeared with counsel before Administrative Law Judge ("ALJ") Michael R. Dunn, who considered the case *de novo*. (Tr. 19-27, 32-69.) In a June 17, 2011 decision, the ALJ found that Plaintiff was not disabled. (Tr. 19-27.) The ALJ's decision became the final decision of the Commissioner on October 14, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff filed this suit on November 18, 2011. (Compl. at 1, ECF No. 1.)

### B. Background

Plaintiff alleges that she became unable to work on September 1, 2009. (Tr. 19.) She was 45 years old at that time and 48 when the ALJ issued his disability decision. (Tr. 19-21.) Although Plaintiff only completed the eighth grade, she subsequently earned her GED. (Tr. 39.) She also has training (but was not certified) as a nurse's assistant. (Tr. 40.) In the past, she worked in home improvement, as a home attendant, and as a child monitor. (Tr. 21.) Plaintiff lives with her two adult sons. (Tr. 41.)

#### 1. Plaintiff's Testimony at the Hearing Before the ALJ

At the March 23, 2011 hearing before the ALJ, Plaintiff testified primarily about her asthma and chronic obstructive pulmonary disease ("COPD") ("a group of lung diseases that block airflow as you exhale and make it increasingly difficult for you to breathe," Mayo Clinic, *COPD: Definition*

2

http://www.mayoclinic.com/health/ copd/DS00916/ (last visited Aug. 9, 2012)). (Tr. 38.) Plaintiff, who was a heavy smoker for over ten years (but has since quit), stated that her breathing problems caused her to stop working. (Tr. 42, 232.) She explained that she had a contract to paint several houses, but, because of the associated fumes and dust, she "got sick . . . [and] was only able to complete three." (Tr. 42-43.) Plaintiff testified that, over the past two years, her breathing problems required emergency-room treatment. (Tr. 46-48.) She further stated that she required hospital admissions in July, September, and November 2010. (Tr. 47.)

In terms of activities of daily living and functional limitations, Plaintiff stated that her coughing and shortness of breath prevent her from sleeping well. (Tr. 49.) She has to sleep upright because she "can't breathe in a flat position." (Tr. 57.) She further stated that she can only sleep for two hours at night before having to get up. (*Id.*) Plaintiff testified that her niece has to sit in the bathroom while she bathes because she previously "passed out" in the bathroom. (Tr. 45.) She also testified that her niece has to style her hair and do her laundry for her. (Tr. 51.) She testified that she no longer drives because of "the fumes." (*Id.*) Her sons take care of the shopping, cleaning, and cooking; Plaintiff explained: "shopping is too much walking [for me] . . . . Cooking —I set the house on fire twice . . . . [And] the cleaning supplies . . . make [me] sick . . . [from the] smells." (Tr. 50-51.) She testified that she could only stand for fifteen to twenty minutes, walk a quarter- or half-block, and lift an eight-ounce glass of water before becoming tried or having difficulty breathing. (Tr. 56-57.)

Regarding her asthma and COPD medications, Plaintiff testified that she currently takes an

3

Albuterol inhaler every four hours and Prednisone.[1]  (Tr. 43.)  She testified, however, that she cannot afford other prescribed medication, including Asmanex and Foradil.[2]  (Tr. 43.)  Plaintiff acknowledged that when she was hospitalized she was given a list of places to call to obtain the prescribed medications; she maintained, however, that the clinics did not cover the medications.  (Tr. 46.)  She explained, "They had different medications that didn't work. . . . [N]one of the places they sent me to gave me the medication that I need. . . . [The substitutes] don't work."  (Tr. 46.)  The ALJ also asked Plaintiff if she had been prescribed oxygen for home use, and Plaintiff responded, "No, sir, just from the hospital."  (Tr. 42.)  Later in the hearing, however, Plaintiff indicated that a doctor had recommended oxygen for at-home use, but she did not "have insurance to get it."  (Tr. 52.)

---

[1]"Albuterol is in a class of medications called bronchodilators.  It works by relaxing and opening the air passages to the lungs to make breathing easier."  AHFS Consumer Medication Information, *Albuterol*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355/ (last visited Aug. 14, 2012).

"Prednisone is an oral steroid medication.  That means that after taking prednisone by mouth (orally), it goes directly into the bloodstream, unlike inhaled steroids (anti-inflammatory asthma inhalers) that go straight to the lungs."  WebMD, *Prednisone and Asthma*, http://www.webmd.com/asthma/guide/prednisone-asthma (last visited Aug. 14, 2012).

[2]Plaintiff testified that her only income consists of "$71.00 every two weeks for child support."  She also testified that she applied for Medicaid, but that "they put [the decision] off" pending the disability decision.  (Tr. 41, 44.)

Asmanex or "Mometasone inhalation is not used to treat an asthma attack (sudden episode of shortness of breath, wheezing, and coughing) that has already started.  Mometasone is in a class of medications called corticosteroids.  It works by decreasing swelling and irritation in the airways to allow for easier breathing."  AHFS Consumer Medication Information, *Mometasone Oral Inhalation*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000461/ (last visited Aug. 14, 2012).

Foradil or "Formoterol is in a class of medications called long-acting beta agonists (LABAs).  It works by relaxing and opening air passages in the lungs, making it easier to breathe."  AHFS Consumer Medication Information, *Formoterol Oral Inhalation*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000203/ (last visited Aug. 14, 2012).

4

### 2. Medical Evidence

#### (a) Plaintiff's Emergency Room Visits and Hospitalizations Between September 2009 and November 2010

Plaintiff made several trips to the emergency room ("ER") at the St. John Hospital & Medical Center ("St. John Hospital") for asthma attacks and COPD exacerbation between September 2009 and November 2010. (Tr. 264, 489.) Further, she was admitted to the St. John Hospital on six occasions when her breathing was not stabilized in the ER. (Tr. 199, 207, 264, 299, 433, 489.)

The record reflects that Plaintiff was first admitted to the hospital for asthma and COPD exacerbation on December 2, 2009. (Tr. 218.) A chest x-ray revealed "increased lung volume" consistent with COPD. (Tr. 221.) Doctors prescribed a number of asthma medications and told Plaintiff to continue the use of her rescue inhaler as needed. They also referred Plaintiff to the St. John Community Health Center for a follow up appointment. (Tr. 218-19.) It appears that Plaintiff was discharged on or around Dec. 4, 2009. (*See* Tr. 218, 220.)

On January 7, 2010, Plaintiff was admitted to the hospital for acute asthma and asthma-induced shortness of breath. (Tr. 207, 384.) Plaintiff was diagnosed with "severe acute COPD exacerbation." (Tr. 382.) A CT scan of Plaintiff's chest revealed "evidence of pulmonary hyperinflation and some emphysematous changes in the lungs bilaterally." (Tr. 400.) While in the hospital, Plaintiff received "treatment in [the] form of [intravenous] steroids," "breathing therapy," and oxygen therapy to maintain her "O2 saturation" at normal levels. (Tr. 208.) Plaintiff was prescribed a "steroid and [A]lbuterol inhaler" and Spiriva, as well as Asmanex and Foradil (two medications Plaintiff testified that she was unable to obtain). (Tr. 208, 382.) Prior to her discharge, Plaintiff consulted with Ms. Diane Harp, a social worker, to help her obtain free medical care and free medications. (Tr. 396-99.) Ms. Harp's consultation notes state, "Social work met with patient

5

and provided patient with resources on free health clinics and places patient can get free medications like [C]rossroads.  Patient plans to follow up at the St. John clinic on [January 18, 2010]. . . .  Social work will fill patient's discharge medications."  (Tr. 399.)

On January 16, 2010, before Plaintiff could follow up at the clinic, Plaintiff was admitted to the hospital and then the intensive care unit for two days.  (Tr. 199, 205.)  Plaintiff stated that she had been "recently discharged [from the hospital] but did not take her medications at home."  (Tr. 201.)  A CT scan of Plaintiff's chest revealed chronic inflammation "of all lobes of the lungs and . . . hyperinflation, compatible with COPD."  (Tr. 203.)  The report noted, "There are new infiltrates [i.e. foreign biological particles] in the lower lobes and to a greater degree in the right middle lobe of the lung."  (*Id.*)  Plaintiff was diagnosed with acute respiratory failure secondary to acute COPD exacerbation and bronchiectasis.  (*Id.*)  While Plaintiff was in the ICU she was placed on a number of medications including Albuterol, a bronchodilator, an anti-inflammatory antibiotic, an intravenous corticosteroid, and some drugs for anxiety. (Tr. 199.)  On January 19, 2010 she was discharged from the hospital, and instructed to continue a tapering "dose of steroids and bronchodilators and inhalers . . . [and to attend] followup appointments with pulmonary and her primary care physician."  (Tr. 200.)

Plaintiff followed up at the St. John Community Health Center on February 9, 2010.  (Tr. 225.)  Plaintiff reported that when she took her Albuterol/Atrovent nebulizer, Spiriva, Asmanex, and Foradil she did not need her Albuterol rescue inhaler.  (*Id.*)  It also appears that Plaintiff stated that on that drug combination, she was "doing her best recently" (the handwritten word "recently" is borderline illegible).  (*Id.*)  The St. John Community Health Center doctor continued Plaintiff's Spiriva and Albuterol inhaler prescriptions, but discontinued the Atrovent/Albuterol nebulizer in

6

favor of an Atrovent nebulizer, and discontinued Asmanex and Foradil in favor of Advair.  (Tr. 227.)

Plaintiff next visited the ER on May 19, 2010 complaining of a painful cough with white phlegm.  (Tr. 376.)  Plaintiff admitted that she was "'supposed to take medicine for my COPD.'" (Tr. 375.)  Plaintiff was diagnosed with COPD exacerbation and treated with Albuterol, Atrovent, and Tylenol.  (Tr. 256.)  Plaintiff responded well to treatment and was discharged a few hours later. (Tr. 375.)

Plaintiff returned to the ER on July 10, 2010 because of "severe[]" shortness of breath.  (Tr. 286.)  She noted that she had run out of her medications.  (*Id.*)  Plaintiff was admitted to St. John Hospital for observation.  (Tr. 284, 290.)  An x-ray showed that Plaintiff's chest was "hyperinflated but clear."  (Tr. 275.)  Plaintiff was diagnosed with "acute exacerbation of asthma secondary to [medicine] noncompliance and weather."  (Tr. 274.)  The doctor noted that Plaintiff was having trouble maintaining her medications because of financial issues.  (*Id.*)   After being stabilized, Plaintiff was discharged on July 12, 2010 with a pamphlet on asthma prevention and the following prescriptions: ProAir HFA (Albuterol) and Spiriva, as well as Foradil and Asmanex.  (Tr. 266.)

Plaintiff was again admitted to the hospital on July 22, 2010 for "worsening shortness of breath associated with cough and congestion."  (Tr. 451, 463.)  An initial assessment of Plaintiff's condition revealed that she was wheezing on both exhalation and inhalation and her oxygen saturation level was only 92%.  (*Id.*)  A chest x-ray revealed that Plaintiff's lungs were "hyperinflated suggestive of COPD," but the x-ray showed "no localized masses or opacities."  (Tr. 314.)  Subsequently, "she was started on [an] intravenous corticosteroid, given morphine for pain, started on IV fluids, given bronchodilators and admitted for further treatment for COPD exacerbation."  (Tr. 451.)  Dr. Ryan Kamp, a pulmonary specialist, diagnosed Plaintiff with acute

exacerbation of COPD and anxiety.  (Tr. 313.)  He noted that Plaintiff was receiving corticosteroids for her COPD and recommended that Plaintiff "have social work involvement regarding obtaining of medications at home as this seems to be a difficulty for her."  (*Id.*)  Plaintiff once again met with social worker Ms. Diane Harp, who "provided [Plaintiff] with resources on free and low cost health clinics in the area and places [Plaintiff could] get free medications like [C]rossroads."  (Tr. 472.)  Ms. Harp also noted that social work would fill Plaintiff's "discharge medications," and would follow up with Plaintiff.  (*Id.*)  On July 25, 2010, Plaintiff was discharged in stable condition having "a good clinical response to treatment."  (Tr. 451.)  Plaintiff was prescribed Albuterol inhalation solution, ProAir HFA (Albuterol inhaler), Atrovent, Asmanex, Foradil, and Spiriva.  (Tr. 453-54.)

Plaintiff returned to the ER on September 14, 2010 complaining that her nebulizer was ineffective.  (Tr. 364.)   Plaintiff reported shortness of breath and wheezing with a "productive cough" over the prior couple of days.  (Tr. 443.)  Plaintiff said that the "attack was triggered by extra [at] home work . . . and hearing some stressing news."  (*Id.*)  The examining physician noted that Plaintiff was not taking Asmanex, Foradil or Spiriva "because of [the] high cost and no medical insurance."  (*Id.*)  He diagnosed Plaintiff with COPD and asthma exacerbation.  (Tr. 448.)  He recommended intravenous steroids, breathing treatments, Zithromax, and Qvar, which, according to the physician, was a "generic which patient can offer to pay for as [an outpatient] instead of Asmanex or Spiriva which she never got."  (Tr. 448.)  Plaintiff was discharged from the ER on September 15, 2010.  (Tr. 362.)

Plaintiff's sixth and last hospital admission detailed in the administrative record was on November 30, 2010.  (Tr. 502.)  The initial assessment in the ER indicated that Plaintiff had ninety-three percent oxygen saturation.  (Tr. 502.)  Plaintiff was admitted for COPD exacerbation and acute

8

bronchitis  "secondary to worsening shortness of breath and fever [for one] day."  (Tr. 490.)  Dr. Kamp again examined Plaintiff.  (Tr. 515.)  He noted that Plaintiff's asthma and COPD "seems to be fairly severe and irreversible now."  (*Id.*)  He  continued, "[Plaintiff] is only taking albuterol at home. . . . [Plaintiff] did not have any improvement with her albuterol . . . . [but] now states her breathing [has] improved [compared to] when she came in."  (*Id.*)  Dr. Kamp diagnosed her with "severe COPD with acute exacerbation."  (Tr. 516.)  Dr. Kamp noted that Plaintiff was receiving "IV corticosteroids as well as antibiotics . . . . [and] should also be on a long-acting beta agonist [like Foradil], inhaled corticosteroid and Spiriva as an outpatient."  (*Id.*)  Plaintiff responded well to treatment, but was discharged against medical advice on December 4, 2010.[3]  (Tr. 490.)  Upon discharge, Plaintiff was not prescribed any new medications.  (Tr. 493-94.)

### (b) Opinion Evidence

On June 2, 2010 (after Plaintiff's third hospital admission), Dr. Sonia Ramirez, a specialist in internal medicine, examined and evaluated Plaintiff for the Social Security Administration.  (Tr. 232.)  Dr. Ramirez conducted breathing tests on Plaintiff, which showed that Plaintiff's breathing difficulties did not meet the relevant Social Security Administration Listing.  (Tr. 235); *See* 20 C.F.R. Pt. 404, Subpt. 404, App. 1 § 3.00E.  She diagnosed Plaintiff with COPD and Emphysema. (Tr. 234.)  Dr. Ramirez concluded:

> [Plaintiff] ends up in the emergency room every time because she runs out of medication but when she is taking her medication she feels fine.  I do not think she can do the same [home improvement job] but I think once she is stabilized and she continues her medication she would be able to do some other kind of sit down job

---

[3]Her discharge was complicated because Plaintiff initially indicated she was depressed and had thoughts of killing herself.  (Tr. 490.)  She did not leave until after her breathing had been stabilized.  (*Id.*)

which does not require any walking or lifting.

(Tr. 234.)

### 3. The Vocational Expert's Testimony

For the purpose of determining whether jobs would be available for someone with Plaintiff's functional limitations, a vocational expert ("VE") offered testimony about job availability for hypothetical individuals with varying functional limitations. The ALJ first asked the VE to assume a hypothetical individual

> of [Plaintiff's] age, education, prior work experience and skill set . . . . [who is] limited to sedentary work, lifting up to 10 pounds occasionally . . . standing or walking for approximately two hours per eight-hour work day, and sitting for approximately six hours per eight-hour work day, with normal breaks . . . . [and who] can occasionally climb ladders, ropes, or scaffolds, ramps or stairs, balance, stoop, crouch, kneel and crawl . . . . [but who] should avoid all exposure to environmental irritants such as fumes, odors, dust, and gases.

(Tr. 65.) The VE testified that this hypothetical individual could perform work at the sedentary, unskilled level as a surveillance system monitor, ticket counter, and table worker (with 260, 7,300, and 3,700 jobs available in the regional labor market, respectively). (Tr. 65-66.)

The ALJ next asked the VE to consider the same hypothetical individual but with the following additional limitations:

> [The individual] should never climb ladders, ropes, or scaffolds . . . . [and that] the worker must avoid even moderate exposure to extreme cold or extreme heat, as well as, exposure to wetness or humidity . . . [and] poorly ventilated areas . . . . [and that] the work must be limited to . . . unskilled work . . . . [and] must be performed in a work environment free of fast-paced production requirements, and involving only simple work-related decisions with few, if any, work place changes.

(Tr. 66.) The VE testified that "the jobs [previously] identified . . . fit this classification." (*Id.*)

10

The ALJ then asked the VE to assume an individual who, because of breathing treatments, would "be off task in excess of 20 percent of the day . . . in addition to regularly scheduled breaks." (Tr. 67.)  The VE testified "there would be no competitive employ[ment]" for that individual.  (*Id.*)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age,

11

education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, ALJ Michael Dunn found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of September 1, 2009. (Tr. 21.) At step two, he found that Plaintiff had the following severe impairments: asthma and chronic obstructive pulmonary disease ("COPD"). (Tr. 22.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.*) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except never climb ladders/ropes/scaffolds; occasional balancing, stooping, crouching, kneeling, crawling; avoid even moderate exposure to extreme cold, extreme heat, wetness or humidity; avoid all exposure to environmental irritants such as fumes, odors, dusts, and gases; avoid even moderate exposure to poorly ventilated areas; work is limited to simple unskilled tasks at SVP 1 or 2 as defined in the Dictionary of Occupational Titles (DOT), free of fast paced production requirements and involving only simple work-related decision[s] with few if any work place changes.

(*Id.*) At step four, the ALJ found that Plaintiff was "unable to perform any past relevant work." (Tr. 25.) At step five, the ALJ stated that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 26.)

12

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that The Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this

13

Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

### F. Analysis

Plaintiff raises two claims of error on appeal but it is sufficient to focus on one. Plaintiff argues that the ALJ erred by, on the one hand, assigning Dr. Sonia Ramirez's opinion, which found that Plaintiff required a "sit down job which does not require any walking or lifting," "great" weight but, on the other hand, crafting a residual functional capacity that permits Plaintiff to perform up to two hours of standing or walking in an eight-hour workday and lifting ten pounds up to one-third of the workday. (Pl.'s Mot. Summ. J. at 9-11, ECF No. 10.) The Court finds that this claim of error has merit and requires a remand for further assessment of Plaintiff's disability claim.

A claimant's residual functional capacity ("RFC") is the most the claimant can still do despite her limitations, S.S.R. 96-8p, 1996 WL 374184 at *2, and is used by an ALJ in determining whether a claimant can return to her past work (step four of the disability analysis) or perform other work (step five). In crafting a claimant's RFC, an ALJ is required to explain how the evidence

14

supports the limitations that the ALJ selected for the claimant:

>                   NARRATIVE DISCUSSION REQUIREMENTS
>
> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.*

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (emphasis added, internal footnote omitted).[4]

Dr. Ramirez — a DDS consulting physician — provided:

> [Plaintiff] ends up in the emergency room every time because she runs out of medication but when she is taking her medication she feels fine. I do not think she can do the same [home improvement job] but I think once she is stabilized and she continues her medication she would be able to do *some other kind of sit down job which does not require any walking or lifting*.

(Tr. 234 (emphasis added).)   In weighing this opinion, the ALJ explicitly acknowledged the language just emphasized:

> Sonia Ramirez, M.D., conducted an independent internal medicine consultative exam on the claimant on June 2, 2010, diagnosing the claimant with COPD/Emphysema.  Dr. Ramirez noted the claimant's

---

[4]SSRs "are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990))).

noncompliance.  Despite her chronic symptoms, Dr. Ramirez opined the claimant could perform *some kind of sit down job, which does not require any walking or lifting* (Exhibit 4F).

(Tr. 24 (emphasis added).)  And — in the very next sentence — the ALJ concluded, "The objective and other substantial evidence of record supports this opinion and the undersigned gives it 'great' weight as later discussed." (*Id.*)  (The ALJ did not "later discuss[]" Dr. Ramirez's opinion, however; he stated only, "When considering the state agency reports, as well as the claimant's daily activities of housekeeping, shopping, laundry, and meal preparation, the undersigned finds the claimant is capable of work as set forth in more detail in the remaining residual functional capacity, particularly noting the absence of any significant longitudinal treatment history to the contrary."  (Tr. 25.))

After reading the ALJ's narrative, the Court is left to speculate as to how the ALJ gave "great" weight to Dr. Ramirez's opinion, including the emphasized language, yet provided that Plaintiff's RFC permitted work requiring up to two hours of standing and/or walking in an eight-hour workday and lifting up to ten pounds one-third of an eight-hour workday.  (*See* Tr. 22 (citing 20 C.F.R. §§ 404.1567(a), 416.967(a)).)  The narrative therefore falls short of what is required for meaningful appellate review.  *See Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) with approval for the proposition that an "ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."); *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011) *report adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) ("'[A] court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and

16

the result.'" (quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009)));

*Grandchamp v. Comm'r of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan.

25, 2010) *report adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010)

("'While the ALJ is not required to address every piece of evidence, he must articulate some

legitimate reason for his decision.  Most importantly he must build an accurate and logical bridge

from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.

2000))).  And to the extent that the Court was forced to speculate, the ready inference is not

favorable to the Commissioner: it appears that the ALJ impermissibly adopted Dr. Ramirez's finding

that the claimant could perform a sit-down job while rejecting Dr. Ramirez's two claimant-favorable

qualifications: no walking or sitting.  *See Davis v. Comm'r of Soc. Sec.*, No. 10-14518, 2011 WL

7330518, at *8 (E.D. Mich. Oct. 27, 2011) *report adopted by* 2012 WL 511937 (Feb. 16, 2012)

("Despite [the ALJ's statement that he gave 'great weight' to [the state agency physician's] opinion,

the ALJ did not so much adopt the findings as 'cherry pick' the portions that supported a

non-disability finding and ignore the rest.").

     The Commissioner responds that the ALJ did not err because Dr. Ramirez's words, when

taken in context, do not mean what they literally say:

> [W]hen Dr. Ramirez's limitation on walking and lifting is viewed in
> context, it appears that Dr. Ramirez was contrasting the degree of
> walking and lifting to Plaintiff's former occupation, home
> improvement work, which was medium exertional work.  (Tr. 64,
> 234).  Dr. Ramirez's statement indicates that she still felt Plaintiff
> was able to work in a less taxing occupation when compliant with
> medication use (Tr. 234).

(Def.'s Mot. Summ. J. at 12.)  The Court agrees that it is unlikely that Dr. Ramirez meant that

Plaintiff could do absolutely no walking (not even to and from her desk, for example) or absolutely

no lifting (answering a telephone, for example).  Indeed, during Dr. Ramirez's exam of Plaintiff,

Plaintiff was able to perform some walking in the exam room.  (Tr. 233.)  Further, Plaintiff herself

testified that she could walk a quarter- or half-block and lift an 8 oz. glass of water.  (Tr. 56-57.)

But accepting the Commissioner's point — i.e., that Dr. Ramirez's opinion precluded only

"[significant] walking or lifting" as opposed to "any walking or lifting" — does little to reconcile

the inconsistency of assigning her opinion "great" weight while simultaneously finding that Plaintiff

could perform work that requires up to two hours of standing and/or walking and lifting up to ten

pounds occasionally.  As Plaintiff points out, even if she could, say, walk for a total of one hour in

an eight-hour workday and lift 5 pounds an occasional basis, the occupational base of unskilled,

sedentary jobs could be substantially eroded:

> If an individual is unable to lift 10 pounds or occasionally lift and
> carry items like docket files, ledgers, and small tools throughout the
> workday, the unskilled sedentary occupational base will be eroded.
> The extent of erosion will depend on the extent of the limitations.
> For example, if it can be determined that the individual has an ability
> to lift or carry slightly less than 10 pounds, with no other limitations
> or restrictions in the ability to perform the requirements of sedentary
> work, the unskilled sedentary occupational base would not be
> significantly eroded; however, an inability to lift or carry more than
> 1 or 2 pounds would erode the unskilled sedentary occupational base
> significantly.  For individuals with limitations in lifting or carrying
> weights between these amounts, consultation with a vocational
> resource may be appropriate. . . .
>
> The full range of sedentary work requires that an individual be able
> to stand and walk for a total of approximately 2 hours during an
> 8-hour workday. If an individual can stand and walk for a total of
> slightly less than 2 hours per 8-hour workday, this, by itself, would
> not cause the occupational base to be significantly eroded.
> Conversely, a limitation to standing and walking for a total of only a
> few minutes during the workday would erode the unskilled sedentary
> occupational base significantly. For individuals able to stand and
> walk in between the slightly less than 2 hours and only a few
> minutes, it may be appropriate to consult a vocational resource.

S.S.R. 96-9p, 1996 WL 374185, at *6.[5]  There was no VE testimony regarding job availability for someone with walking or lifting limitations below the thresholds for sedentary work.[6]

Finally, although the Commissioner does not make a developed harmless error argument, the Court finds that the other evidence of record does not weigh so strongly against Plaintiff that a remand would be nothing more than a writing exercise for the ALJ.  *See NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality"); *see also M.G. v. Comm'r of Soc. Sec.*, — F. Supp. 2d —, No. 10-12957, 2012 WL 954638, at *13-14 (E.D. Mich. Mar. 21, 2012) (discussing harmless error standard outside the context of the treating-source rule).

The ALJ's strongest reason for finding Plaintiff not disabled was Plaintiff's noncompliance with prescribed treatment:

> When a claimant alleges a condition severe enough to be disabling, there is a reasonable expectation that the claimant will not only seek

---

[5]The Court recognizes that the ALJ did not find that Plaintiff could perform the "full range of sedentary work."  But the ALJ's restricted range of sedentary work did not limit the walking, standing, or lifting requirements associated with that exertional level.

[6]It would appear that the Commissioner has waived the following argument, but the Court nonetheless notes that Dr. Ramirez did give a "medical opinion."  It is true that if a physician states that a claimant is "unable to work," without describing functional limitations, that type of statement is not considered a medical opinion.  *See* 20 C.F.R. § 404.1527(d).  But in this case, Dr. Ramirez went beyond opining about Plaintiff's ability to do a sit-down job to include functional limitations on walking and lifting.  As an analogous but easier to analyze example, a physician's statement that "I do not think she can do the same [home improvement job] but I think once she is stabilized and she continues her medication she would be able to do *some other kind of sit down job which does not require [more than one hour of] walking or lifting [more than five pounds]*," would certainly qualify as a "medical opinion."  The Court sees no material distinction between this example and Dr. Ramirez's statement.

> examination and treatment, but also follow doctor's advice. The
> failure of the claimant to seek examination and treatment for the
> condition and follow doctor's advice reflects poorly on the credibility
> of the claimant and the assertions that the condition is disabling.

(Tr. 23.)

Without deciding whether the ALJ's adverse inference is in accord with S.S.R. 82-59 (*see* Pl.'s Mot. Summ. J. at 14), the Court finds merit in Plaintiff's claim that her inability to pay for certain prescription medications partially excuses her noncompliance. It is true that during a January 2010 hospitalization, Plaintiff stated that she had been "recently discharged [from the hospital] but did not take her medications at home." (Tr. 201.) On the other hand, records from Plaintiff's visit to the St. John Community Health Center on February 9, 2010 support Plaintiff's excuse for noncompliance. At that visit, Plaintiff stated that when she took a certain combination of drugs — which included both Asmanex and Foradil — she did not need a rescue inhaler and that she had been "doing her best recently." (Tr. 225.) But the clinic did not maintain that drug combination — critically, the clinic discontinued Asmanex and Foradil in favor of Advair. (Tr. 227.) This is entirely consistent with Plaintiff's testimony that (1) she could not afford Asmanex or Foradil (Tr. 43), and (2) the clinics she tried "had different medications that didn't work. . . . [N]one of the places they sent me to gave me the medication that I need. . . . [The substitutes] don't work" (Tr. 46). Notably, Plaintiff was prescribed Asmanex and Foradil in hospitalizations post-dating the February 2010 clinic visit. (Tr. 266, 453-54; *see also* Tr. 516.)

The Commissioner further urges the Court to discount Plaintiff's asserted justification for noncompliance by claiming that "the record reflects that Plaintiff was able to afford certain medications," in particular, Xanax and Qvar. (Def.'s Mot. Summ. J. at 15.) But the record evidence cited by the Commissioner does not support this claim. (*See id.*) As for Xanax, Plaintiff was given

that medication while she was hospitalized and then requested "Xanax for discharge."   (Tr. 200, 416.)  Nothing suggests that Plaintiff was able to afford the prescription — in fact, contemporaneous records indicate that social work was helping to fill Plaintiff's discharge medications and that Plaintiff had no insurance. (Tr. 396-97.)  As for Qvar, the physician did not, in the Commissioner's words, state that "Plaintiff could afford to pay for Qvar."  (Def.'s Mot. Summ. J. at 15.)  The physician in fact stated, "start Qvar (generic which patient can *offer* to pay for as [outpatient] instead of [Asmanex] or Spiriva which she never got)." (Tr. 448 (emphasis added).)  This statement appears to be more about the method of payment rather than the ability to pay.  And, even granting the Commissioner the benefit of the doubt, it remains that Plaintiff's testimony was that substitute drugs were not effective.  (Tr. 43, 46.)

Accordingly, while Plaintiff's failure to comply with prescribed treatment does support the ALJ's conclusion that her symptoms may not have been as severe as she testified (which, in turn, supports the ALJ's conclusion that Plaintiff could perform the restricted range of sedentary work as set forth in the RFC assessment), the Court finds that the inference is not as strong as implied by the ALJ or the Commissioner on appeal.

The ALJ below maintained, and the Commissioner argues here, that Plaintiff's activities of daily living ("ADLs") also support the existing RFC assessment. (Tr. 24.)  While the Court does not disagree entirely, the Court again questions the degree of support.  It is true that, on one occasion, Ms. Harp noted that Plaintiff was independent with her ADLs. (Tr. 397.)  The statement is vague, however, as to the extent of the ADLs (e.g., dressing versus vacuuming).   The Commissioner also points out that Plaintiff must be able to do "some amount of house work" because she was once hospitalized because of "extra" housework.  (Def.'s Mot. Summ. J. at 13.)

21

The Court agrees that "extra" implies some baseline, but where that baseline lies is completely unknown. Finally, the Commissioner points out that because Plaintiff testified that she twice started a fire when trying to cook (which, Plaintiff said, landed her in the hospital), she can cook at least sometimes. (*Id.*) The inference is tenuous and the attempts were apparently infrequent, and it is unknown when Plaintiff last tried to cook. Given the limited evidence of activities of daily living, coupled with Plaintiff's testimony that she engages in no significant activity (Tr. 50-51), the Court finds that Plaintiff's ability to perform some unknown degree of ADLs only marginally supports the ALJ's RFC assessment. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) ("Kalmbach indeed testified that she went to the grocery store, the pharmacy, and church, and that she was able to prepare her own meals most of the time, and usually able to dress herself without assistance. She was able to drive, but had to limit it to less than thirty minutes per day. These minimal activities are hardly consistent with eight hours' worth of typical work activities."); *cf. Rose v. Astrue*, No. 10-289-GWU, 2011 WL 1885399, at *6 (E.D. Ky. May 18, 2011) ("While the undersigned agrees that minor daily activities such as watching television and preparing simple meals are not very convincing evidence of an ability to perform full-time work, the plaintiff's admitted activities in this particular case go far beyond these limited actions, as described above.").

On the other side of the scale, the Court notes that Dr. Ramirez, examining Plaintiff on behalf of the DDS, was an unbiased evaluator. Her opinion is the only medical opinion in the entire record. No physician found that Plaintiff could do significant walking or lifting — or even the walking or lifting required for sedentary work. Moreover, Dr. Ramirez appeared to opine about Plaintiff's ability when Plaintiff *was* compliant with medication: "*I think once she is stabilized and she continues her medication* she would be able to do some other kind of sit down job which does not

22

require any walking or lifting." (Tr. 234 (emphasis added).)

In sum then, while substantial evidence may ultimately support the ALJ's disability conclusion, that determination would be significantly aided by an explanation of how Dr. Ramirez's walking and lifting limitations — which presumably were given "great" weight — are accounted for in the ALJ's residual functional capacity assessment. Because the ALJ's failure-to-articulate is not readily dismissed as harmless, it is for the ALJ — not the Court — to incorporate Dr. Ramirez's findings with the other evidence of record in the first instance. *See Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision post hoc even when substantial evidence exists to support the ALJ's decision"); *Juarez v. Astrue*, No. 2:09-cv-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010). Remand is therefore warranted.

### G. Conclusion

For the reasons set forth above, this Court finds that the ALJ did not adequately explain his reasons for denying Plaintiff benefits. Because this error inhibits the Court's substantial evidence review, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: August 17, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 17, 2012.

s/Jane Johnson
Deputy Clerk

24